**In re Petition of Alfredo Jorge GARCÍA AVILA, as Foreign Representative of Grupo Tribasa, S.A. DE C.V., and Triturados Basálticos y Derivados, S.A. DE C.V., Debtors in Foreign Proceedings.**

**No. 03–14025 (SMB).**

United States Bankruptcy Court, S.D. New York.

July 31, 2003.

## MEMORANDUM DECISION GRANTING MOTION FOR PRELIMINARY INJUNCTION

STUART M. BERNSTEIN, Chief Bankruptcy Judge.

Grupo Tribasa, S.A., de C.V. ("Tribasa") and its subsidiary, Triturados Basálticos y Derivados, S.A. de C.V.("Triturados," and collectively with Tribasa, the "Debtors") are Mexican corporations, and debtors under Mexico's *Ley de Concursos Mercantiles,* or Business Reorganization Act, which became effective on May 13, 2000 (the "Mexican Act"). They contemplate funding their plan with the proceeds of a third party certain bond offering described below. Through their representative, they commenced this ancillary case under 11 U.S.C. § 304 when a group of creditors attempted to enforce their New York judgments aggregating approximately $13 million against those proceeds.

After granting a limited temporary restraining order that prohibited execution on the bond proceeds, I conducted an evidentiary hearing in connection with the Debtors' motion for a preliminary injunction. For the reasons that follow, I conclude that the Debtors are entitled to preliminary injunctive relief restraining the New York judgment creditors from interfering with or taking steps to enforce their judgments against the bond proceeds, or the toll road receipts that will be used to repay the bond debt, pending approval of the Debtors' plan or other disposition of their Mexican bankruptcy case.

Piper Rudnick LLP, Howard S. Schrader, Esq., Timothy W. Walsh, Esq., Of Counsel, New York City, for Petitioner.

Arkin Kaplan LLP, Howard J. Kaplan, Esq., Steven K. Barentzen, Esq., Of Counsel, New York City, for the Lipstick Group Creditors a/k/a the Smith Parties.

### BACKGROUND[1]

#### A. The Mexican Toll Road Program

At the beginning of the 1990s, the Mexican government initiated a Toll Road Pro-

---

**1.** The "Background" discussion regarding the Debtors' business and the Mexican toll road program comes from the Preliminary Prospectus, dated May 30, 2003 relating to the

gram for the purpose of providing a means of communication and increasing socioeconomic and cultural development.[2] Under the Toll Road Program, the Mexican government granted a concession, or license, for a specific duration, to build (or improve) toll roads. During the period covered by the concession, the concessionaire was entitled to collect tolls paid by the users of the road, and after paying certain amounts to the government, keep the balance. Thus, the concessionaire acquired a right to a stream of future income measured by the net toll receipts.

Instead of waiting to collect future revenues, the concessionaire could realize the proceeds immediately through the process of securitization. Reduced to its basic terms, a securitization works in the following manner: the concessionaire assigns its toll collection rights to a trust. The trust issues debt, and pays the net proceeds from the sale of the debt in accordance with the trust or other related agreements. The proceeds may be payable to third parties, the concessionaire, or a combination of the two. The trust then collects the tolls, and uses the collections to pay the principal and interest on the debt. After the debt has been paid in full, the remaining collection rights, if any, revert to the concessionaire.

### B. The 1993 Trust

The Debtors, along with various non-debtor affiliates, are engaged, *inter alia,* in the construction and operation of toll roads in Mexico. Tribasa acquired numerous concessions through direct and indirect subsidiaries but only two—the Armería–Manzanillo Toll Road (the "Armería Road") and the Ecatepec–Pirámides Toll Road (the "Ecatepec Road," and collectively with the Armería Road, the "Tribasa Toll Roads")—are involved in this case. Prior to 1993, Promotora de Autopistas del Pacifico, S.A. de C.V. ("PAPSA"), a/k/a the Armería–Manzanillo Concession Company, acquired the concession rights to the Armería Road. The concession expires in July 2015. In addition, Promotora y Administradora de Carreteras, S.A. de C.V. ("PACSA"), a/k/a Ecatepec–Pirámides Concession Company, acquired the concession rights prior to 1993 in the Ecapetec Road. This concession expires in December 2011.

In November 1993, PAPSA and PACSA (sometimes referred to collectively as the "Concessionaires") completed a securitized financing based on the combined revenues of the Tribasa Toll Roads. The securitization worked in the manner described earlier. The Concessionaires transferred their collection rights to the Armería–Epatepec Trust (the "Old Trust"). BBVA Bancomer, S.A. ("Bancomer"), a Mexican bank, serves as trustee (the "Old Trustee") of the Old Trust.

The Old Trust issued notes totaling $110 million that bore interest at the annual rate of 10.5%. The scheduled amortization contemplated repayment in November 2005, but permitted repayment through

---

bond offering, received in evidence as Lipstick Exhibit ("LX") C at the hearing on the preliminary injunction, and a Form 20–F, filed by Tribasa with the United States Securities and Exchange Commission on or about August 4, 1999, and attached as Exhibit 1 to the *Declaration of Howard J. Kaplan,* dated July 1, 2003 (*"Kaplan Declaration "*). A Definitive Prospectus was subsequently filed with the Mexican government on June 16, 2003, and is publicly available, in Spanish, through the web site maintained by Bolsa Mexicana de Valores (www.bmv.com.mx). An English translation has not been provided.

**2.** The Toll Road Program was discussed briefly in *Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.,* 143 F.3d 688, 690–91 (2d Cir.1998), *rev'd,* 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999).

December 2011. The Old Trustee has been repaying the debt in accordance with the 2011 schedule.

## C. The Lipstick Parties' Judgments

In a separate 1993 transaction, Tribasa issued notes guaranteed by Triturados under its Global Medium–Term Note Program. (*See Kaplan Declaration,* Ex. 5.) The notes and the guarantees were governed by New York law, (*id.* § 19.1), and the parties submitted to the jurisdiction and venue of the state and federal courts in New York county in the event of litigation arising out of or relating to notes issued under the program. (*Id.* § 19.2.)

In 1996, Smith Management, apparently acting on behalf of Lipstick Ltd., Barbara Stovall, Gary Smith, Jeffrey A. Smith, John W. Adams, Mary Hilderman Smith, Randall D. Smith, Russell B. Smith and Thomas J. Trzanowski (collectively the "Lipstick Parties"), purchased two separate series of notes having an aggregate face value of $9.5 million.[3] (*See id.* ¶¶ 1, 6.) In 1999, the Debtors defaulted on both series, and the Lipstick Parties commenced an action in New York State Supreme Court. In May 2000, they recovered their first set of default judgments against each of the Debtors in the approximate sum of $6 million. On September 5, 2000, they obtained a second default judgment against Triturados in the approximate sum of $6.3 million, and on November 30, 2001, a corresponding default judgment against Tribasa. On March 22, 2002, they obtained their third set of default judgments against the Debtors in the approximate sum of $700,000.00. As of today, the Lipstick Parties hold judgments aggregating approximately $13 million against each of the Debtors. (*Id.,* Ex. 7.)

### 1. The Restraining Notices

On May 31, 2000, after the first set of default judgments had been obtained, the Lipstick Parties mailed restraining notices and information subpoenas to the Debtors in Mexico. (*Id.,* Ex. 8.) The Debtors failed to respond to the information subpoenas, and by order filed July 1, 2001, Justice Charles E. Ramos held the Debtors in civil contempt. (*Id.,* Ex. 14.) Each was fined $250.00, but could purge the contempt by providing complete and accurate responses to the information subpoenas by August 30, 2001. (*Id.*)

The Debtors did not purge the contempt, and Justice Ramos issued a warrant for the arrest of David Penaloza Sandoval, the Debtors' president. (*See id.,* Exs. 15, 16.) The court's order was affirmed by the Appellate Division, First Department. *Lipstick Ltd. v. Grupo Tribasa, S.A. de C.V.,* 304 A.D.2d 482, 758 N.Y.S.2d 317 (N.Y.App.Div.2003).

### 2. The Turnover of the ITA stock

On December 11, 2000, the Lipstick Parties commenced a special proceeding in New York Supreme Court to compel the Debtors to turnover Tribasa's shares in Inversiones Tecnicas y Aeroportuarios ("ITA"). (*Kaplan Declaration* ¶ 13.) After the Debtors defaulted on the turnover order, the Lipstick Parties obtained an order, issued on November 15, 2001 and filed on November 30, 2001, directing Tribasa to deliver the ITA stock to the Lipstick Parties or the Sheriff of the City of New York together with the documents needed to transfer title. (*Id.,* Ex. 10.)

The Debtors again failed to comply with an order issued by Justice Ramos. As a

---

**3.** In February 2002, Lipstick, Ltd. assigned its interests to Randall D. Smith and Thomas Trzanowski. (*Kaplan Declaration* ¶ 6 n. 2.)

The petitioner has referred to the group as the Lipstick creditors while the latter have referred to themselves as the Smith creditors.

result, and by order filed in November 2002, Justice Ramos held the Debtors, as well as Mr. Sandoval and his wife, Maria Adriana Alanis de Penaloza, in criminal contempt, fined each contemnor $500.00, and sentenced the Sandovals to up to 30 days in jail. (*Id.*, Exs. 21, 22.)

### 3. The Transfer of $7 million

In July and August of 2000, Tribasa transferred $7 million in violation of the restraining notices to National Financiera, a sister bank to Banco Nacional de Comercio Exterior, S.N.C. ("Bancomext"). (*Id.*, Ex. 18, at 4–5.) As a result, Justice Ramos again held the Debtors and the Sandovals in civil contempt. Justice Ramos also fined the Debtors $500.00 and awarded a $7 million judgment against the Sandovals, jointly and severally. (*See Kaplan Declaration,* Exs 18, 19). The fines and contempts could be purged by the payment of $7 million into court by December 10, 2002,[4] (*id.*, Ex. 19), but the contempt was never purged.

### 4. The Judgment Execution

On April 25, 2001, the Lipstick Parties also delivered an execution to the Sheriff of the City of New York. (*Id.*, Ex. 11.) The execution related to the initial May 1, 2000 default judgment against Triturados

in the principal sum of approximately $4.7 million, plus post judgment interest. (*Id.*, Ex. 11.) The schedule annexed to the execution contained a "partial list" of Triturados' assets. The list included Triturados' interest in the ITA shares, the funds collected by the Debtors under their toll road concessions, and "any residual interest in such concessions." Nothing was collected through the execution.

## D. The Mexican Bankruptcy Proceedings

On October 16, 2001, the Bancomer and two other bank creditors of the Debtors initiated involuntary bankruptcy proceedings against the Debtors in the First District Court for Civil Matters of Mexico City. (*Declaration of Alfonso M. Lopez Melih Pursuant to 28 U.S.C. § 1746,* dated July 1, 2003 ("*Melih Declaration*"), at ¶ 39.) On March 22, 2002, the Mexican court rejected the Debtors' challenges and declared the Debtors eligible for reorganization.[5] (*Id.* ¶¶ 40–41; Ex. B.) This was the equivalent of an order for relief under title 11. On the same day, the Mexican court issued an order suspending any decree of attachment or enforcement against the Debtors' rights or properties, pending the conclusion of the conciliation stage. (*Id.* ¶ 42; Ex. B, p. 26.)

---

4. The Lipstick Parties also contend that after June 1, 2001, the Debtors transferred $60 million in proceeds from the sale of another road to one of their creditors. (*Kaplan Declaration* ¶ 28.) It does not appear that the Lipstick Parties sought a similar order of contempt based on the $60 million transfer, despite the incentive to do so. The judgments against the Sandovals, contained in the November 2002 contempt order, were limited to the $7 million transfer. The aggregate judgments against the Debtors exceeded $13 million. The $60 million transfer would have provided a basis to obtain a judgment against the Sandovals for the balance of the judgments against the Debtors.

5. The Debtors opposed the bankruptcy, and filed several constitutional challenges, or *amparos,* with the appropriate Mexican court. (*Melih Declaration* ¶¶ 40–41.) The *amparos* resulted in stays of the bankruptcy proceedings, but all stays have been vacated. (Transcript of Preliminary Injunction Hearing, held July 7, 2003 ("Tr."), at 23; Petitioners' Exhibits ("PX") 1, 2.) One *amparo* remains pending. If the appeal is successful, the bankruptcy proceedings will be dismissed. (Tr. 52–53.) If, however, the Debtors' continuing efforts to achieve a consensual reorganization are successful, they will drop the challenge. (Tr. 24–25.)

The conciliation stage referred to the procedure under the Mexican Act. After a bankruptcy petition is granted, the Federal Institute of Business Reorganization Specialists (the "Institute"), an arm of the Mexican federal judiciary, appoints a conciliator. (Mexican Act, Art. 43.) The conciliator performs roles roughly analogous to a chapter 11 trustee, and among other things, mediates and proposes a plan, and thereafter, attempts to get it approved. Natalie Martin, *Que es la Differencia?: A Comparison of the First Days of a Business Reorganization Case in Mexico and the United States*, 10 U.S.-Mex. L.J. 73, 81–82 (2002).

A conciliator was appointed in the Debtors' case on April 8, 2002. (*Melih Declaration* ¶ 43.) As part of his many duties, the conciliator reviewed the claims submitted by the Debtors' creditors, including the Lipstick Parties, (*id.*), and served provisional creditor lists and rankings on the Debtors and each of the putative creditors. (*Id.* ¶ 45.)

The Lipstick Parties appeared through Mexican counsel, and objected to the conciliator's provisional list on three grounds: their claims were stated in Mexican pesos rather than United States dollars, they did not reflect the exchange rate used and they did not include interest. (*Id.*) The conciliator accepted the objections, and submitted a revised calculation of the amount of their claims. (*Id.*)

On September 16 and 20, 2002, the First District Court issued orders acknowledging and ranking the claims of the creditors of Tribasa and Triturados, respectively. (*Id.* ¶ 46; Exs. D, E.) According to the orders, approximately 1,500 creditors held claims exceeding $1 billion. (*Id.* ¶ 46.) The Lipstick Parties' claims were ranked as common or unsecured, the same as all of the other bondholders.[6] (*Melih Declaration* ¶¶ 46–47.)

### E. The New Trust and the Bond Proceeds

The Debtors have been involved in negotiations regarding a plan of reorganization, (Tr. 76), which is currently being drafted by the conciliator.[7] (Tr. 37.) The Debtors anticipate funding their plan through a securitization similar to the one in 1993.[8] In broad terms, PAPSA and PACSA have entered into an Irrevocable Trust Agreement (the "Trust Agreement") with, *inter alia*, Bancomext, as Trustee (the "Trustee"), pursuant to which they have assigned their interests in the Armería and Ecatepec toll road revenues—including those previously assigned to the Old Trust—to the newly formed Trust "free and clear of any liens, encumbrances and limitations of domain." (Trust Agreement § 2.2.) The new Trust, in turn, has raised $190 million through the sale of bonds, and will pay off the bonds with the toll road collections. In addition, the principal and interest payments have been guaranteed by MBIA Insurance Corporation.

The bond proceeds, which are property of the Trust, (Trust Agreement § 4.1(c)),

---

**6.** The Debtors make much of the apparent inconsistency between the Lipstick Parties' acknowledgment before the Mexican court that they hold unsecured claims, and their contention in this Court that they hold judgment liens. As discussed in more detail below, the Mexican Act treats judgment creditors—including those holding judgment liens—as unsecured creditors. Hence, they have not taken inconsistent positions.

**7.** Only the conciliator can submit a reorganization agreement to the court under the Mexican Act. (Tr. 38.)

**8.** The bond offering, and its connection to the Debtors' bankruptcy, are described in the Preliminary Prospectus.

are currently on deposit in an account at Bancomext in Mexico City. (*Affirmation of Howard S. Schrader in Support of Motion for a Preliminary Injunction and a Permanent Injunction*, dated June 30, 2003 ("*Schrader Affirmation*"), Ex. D, p. 23.) Approximately $61 million in proceeds will be paid to the Old Trust in consideration for the assignment of its rights in the toll revenues to the new Trust. After payment of the administrative expenses associated with the bond offering (approximately $26 million) and the funding of maintenance accounts and the Reserve Account (approximately $17 million), the remaining proceeds—approximately $89 million—will be paid to the Debtors' creditors in connection with the bankruptcy case.[9]

On or about June 9, 2003, the Lipstick Parties' attorneys learned of the bond offering and the proceeds. On June 9, 2003 the Lipstick Parties served an information subpoena and restraining notice on Bancomext at its New York office, (*Kaplan Declaration* ¶ 31, *see* Ex. 27), and the next day, served an information subpoena and restraining notice on the New York office of Bancomer, the bond underwriter. (*Id.* ¶ 31, *see* Ex. 28.) The Bancomext restraining notice specifically restrained Bancomext from selling, transferring, or interfering with any property in which the Debtors had an interest. In addition, the Lipstick Parties served judicial deposition

subpoenas on both banks. The banks refused to produce witnesses or documents in response to the subpoenas.

### F. The § 304 proceeding

The enforcement activity directed at Bancomext and Bancomer triggered the filing of this ancillary case on June 19, 2003. After hearing from the attorneys for the Debtors and the Lipstick Parties, the Court issued a limited temporary restraining order ("TRO") on June 20, 2003. The TRO, more or less, mirrored the stay order issued by the Mexican court. It prohibited the Lipstick Parties from executing on the judgments against property of the Debtors "or against property involved in their foreign proceeding," but otherwise permitted the Lipstick Parties to continue their enforcement activities.[10] (*Schrader Affirmation*, Ex. A.) On July 8, 2003, the Court conducted an evidentiary hearing in connection with the Debtors' motion for a preliminary injunction.

### DISCUSSION

### A. The Scope of Injunctive Relief Under § 304(b)(1)

Before addressing the merits of the Debtors' request for injunctive relief, two preliminary issues require consideration. First, the bond proceeds are not the Debtors' property—the proceeds belong to the

---

9. The obligation to fund the bankruptcy plan is amplified in an Insurance and Reimbursement Agreement, dated May 29, 2003, among MBIA, the Trustee, PAPSA and PACSA (the "Reimbursement Agreement"). The Reimbursement Agreement was provided pursuant to a stipulation of confidentiality. Neither the Trust Agreement nor the Reimbursement Agreement specifies the amounts that will used to fund the plan, pay the Old Trustee, satisfy the issuance expenses or deposit in the various accounts. That information is in the Preliminary Prospectus, and with one immaterial change, also appears in the Definitive Prospectus. The Reimbursement Agreement

confirms what was self-evident without it; the bond proceeds will not be paid to the Debtors' creditors if a plan is not approved.

10. Following the issuance of the TRO, the Lipstick Parties obtained a temporary restraining order, dated June 26, 2003, from Justice Ramos. The state court TRO prevented the Debtors, Bancomext and Bancomer from transferring or otherwise disposing of $13 million of the bond proceeds—an amount sufficient to satisfy the Lipstick judgments. (*Schrader Affirmation*, Ex. B.)

Trust. Second, less than half of the proceeds will be used to pay the Debtors' creditors. The initial question focuses, therefore, on whether and to what extent the Court can prevent the Lipstick Parties from attempting to enforce their judgments against these proceeds.

■■■ Section 304(b) specifies the type of ancillary relief that the Court may grant.[11] Section 304(b)(1) permits the bankruptcy court to enjoin the commencement or continuation of any action against a foreign debtor with respect to property "involved in" the foreign proceeding. Property "involved in" a foreign proceeding extends beyond "property of [the debtor's] estate," the type of property that a court may order turned over under § 304(b)(2). *See In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 348–49 (2d Cir.1992)(contrasting the language of § 304(b)(1) and (b)(2), and concluding that under the former, the court need not determine the debtor's interest in the property to be protected by the injunction); *In re Manning*, 236 B.R. 14, 20–21 (9th Cir. BAP 1999)(same); *see In re Rubin*, 160 B.R. 269, 274–75 (Bankr.S.D.N.Y.1993).

■■■ At a minimum, non-estate property is "involved in" a foreign proceeding if it will be paid directly to the creditors or otherwise enhance their recovery. *In re Schimmelpenninck*, 183 F.3d 347 (5th Cir. 1999) provides a clear illustration of this point. There, Byrne, a United States creditor of a foreign debtor that was the subject of a Dutch insolvency proceeding, sued its American subsidiary under alter ego and single business enterprise theories to recover his debt. The curators appointed by the Dutch court commenced a section 304 proceeding to enjoin the continuation of the lawsuit and the threat of a potential execution.

Reversing the lower courts, the Fifth Circuit concluded that the property that the curators sought to protect was involved in the foreign proceeding even if it was not property of the foreign debtor's estate. The value of the foreign debtor's ownership interest in the American subsidiary would be diminished, to the prejudice of all creditors, if Byrne were allowed to seize the subsidiary's assets. 183 F.3d at 362. Additionally, since the debtor's equity in the subsidiary would otherwise be available to creditors, the economic effect of Byrne's lawsuit was the same as a direct suit against the debtor. *Id.* Moreover, the court refused to overlook the fact that Byrne had filed a proof of claim to collect the same debt, and therefore, had "involved" himself in the foreign proceeding. *Id.* at 363.

■■■ Here, although the bond proceeds are property of the Trust rather than the Debtors' estates, the proceeds are "involved in" the Mexican bankruptcy case. A substantial portion of the proceeds is intended for the Debtors' creditors through a plan of reorganization under the Mexican Act. Although the proceeds will

---

**11.** Section 304(b) provides:

Subject to the provisions of subsection (c) of this section, if a party in interest does not timely controvert the petition, or after trial, the court may—
(1) enjoin the commencement or continuation of—
(A) any action against—
(i) a debtor with respect to property involved in such foreign proceeding; or
(ii) such property; or

(B) the enforcement of any judgment against the debtor with respect to such property, or any act or the commencement or continuation of any judicial proceeding to create or enforce a lien against the property of such estate;
(2) order turnover of the property of such estate, or the proceeds of such property, to such foreign representative; or
(3) order other appropriate relief.

not be used to pay claims if a plan is not approved, the conditional nature of their use does not alter the conclusion that they are "involved in" the Mexican bankruptcy proceedings under the broad language of § 304(b)(1). Furthermore, the mere availability of the proceeds is critical to a possible reorganization. In their absence, a plan will not be possible.

In fact, the Lipstick Parties' contention, that they should be allowed to execute on the bond proceeds because they are not property of the Debtors' estates, is internally inconsistent. The success of the Lipstick Parties' enforcement efforts depends on a finding that the proceeds are property of the Debtors under New York law. Like Byrne in *Schimmelpenninck*, the Lipstick Parties' claim to the bond proceeds ultimately depends on proof of an alter ego or other relationship between PAPSA and PACSA on the one hand, and the Debtors on the other, that renders the former liable for the latter's debts. In short, to recover the bond proceeds, the Lipstick Parties must bring those proceeds into the Debtors' estates. All other creditors of the Debtors can assert the same claim to the same bond proceeds, arguably in every jurisdiction in which Bancomext has an office.

Finally, like the *Schimmelpenninck* court, I cannot ignore that the Lipstick Parties, like Byrne, involved themselves in the foreign proceeding. They filed claims for the same debt, and they appeared through Mexican counsel and successfully protested the conciliator's proposed treatment of their claims. Accordingly, I conclude that the bond proceeds are involved in the Mexican bankruptcy proceeding within the meaning of § 304(b)(1).

Furthermore, all of the bond proceeds are "involved in" the Mexican bankruptcy proceedings, and not just the portion destined for the creditors. According to the Preliminary Prospectus, nearly half of the bond proceeds will be used to fund the Debtors' plan. The balance will go to pay the issuance expenses, acquire the toll collection rights from the Old Trust, and fund the maintenance accounts and the Reserve Account. Concededly, these "other" amounts are sufficient to satisfy the Lipstick Parties' $13 million in judgments.

Nevertheless, I cannot lop off the Debtors' share, and subject the balance to the Lipstick Parties' collection efforts. The planned use of the proceeds is an integrated scheme, and the proposal works in its entirety or not at all. The Trustee must satisfy the obligations under the Old Trust, through the transfer of nearly $61 million, to acquire the rights to the toll collections. These revenues are the source of repayment of the bond principal and interest. The issuance expenses of over $26 million must be paid. They are the administrative expenses directly related to the creation of the fund. In addition, the various maintenance accounts must be funded to assure that the physical roads are repaired and maintained. Lastly, the Reserve Account provides extra liquidity and minimizes the risk of a default.

Moreover, the investors bought the bonds under the assumption that the proceeds would be used in a certain way. It would be unfair to change the formula, particularly without notice, and possibly increase the risk of repayment. Consequently, all of the bond proceeds are "involved in" the Debtors' Mexican bankruptcy case.

## B. The Probability of Success on the Merits

■ Ordinarily, a party seeking preliminary injunctive relief must show irreparable harm and either (a) a likelihood of success on the merits, or (b) a sufficiently serious question going to the merits to

make it a fair ground for litigation, and the balance of hardships tipping decidedly in the movant's favor. *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 972 (2d Cir.1989); *Green v. Drexler (In re Feit & Drexler, Inc.),* 760 F.2d 406, 415 (2d Cir.1985).[12] Taking the second prong first, the petitioner is likely to succeed on the merits if he is likely to prevail under § 304(c), the criteria that governs the grant or denial of relief under § 304(b). *See In re MMG LLC,* 256 B.R. 544, 552 (Bankr.S.D.N.Y.2000).

### 1. The Section 304(c) Factors

Section 304(c) identifies six factors to guide the court in determining whether to grant relief under subsection (b) consistent with "what will best assure an economical and expeditious administration of such estate:"

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;

(5) comity; and

(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.[13]

■■■ "The section 304(c) factors reflect the tension between deferring to foreign proceedings and protecting the rights of local creditors," *In re Ionica PLC,* 241 B.R. 829, 834 (Bankr.S.D.N.Y.1999), the "universality" and "territoriality" approaches, respectively, to transnational bankruptcies. *See In re Treco,* 240 F.3d 148, 153 (2d Cir.2001). Under the "universality" approach, the bankruptcy court will generally defer to the proceeding pending in the debtor's home country, and thereby centralize the proceedings before a single court. *Id.* Under the "territoriality" approach, or "Grab Rule," the court in each jurisdiction where the debtor has assets will distribute the local assets in accordance with local law. *Id.*

■■■ Section 304(c) reflects modified "universality," requiring the court to weigh the enumerated factors before deferring to the foreign court. *Id.* at 154. The factors are designed to give the court maximum flexibility, and permit it to "make the appropriate orders under all of the circumstances of each case, rather than being provided with inflexible rules." H.R.Rep. No. 95–595, at 324–25 (1977), U.S.Code Cong. & Admin.News 1978, at 5963, 6281; S.Rep. No. 95–989, at 35 (1978), U.S.Code Cong. & Admin.News 1978, at 5787, 5821; *accord Treco,* 240 F.3d at 154. The court must apply the factors on a case-by-case

---

**12.** Irreparable harm is not required to enjoin an action whose continuation threatens the reorganization process or impairs the bankruptcy court's jurisdiction. *LTV Corp. v. Back (In re Chateaugay Corp.),* 201 B.R. 48, 71–72 (Bankr.S.D.N.Y.1996) (quoting *Alert Holdings, Inc. v. Interstate Protective Servs., Inc. (In re Alert Holdings, Inc.),* 148 B.R. 194, 200 (Bankr.S.D.N.Y.1992)), *aff'd,* 213 B.R. 633 (S.D.N.Y.1997). The exception does not apply in this case. Tribasa is not undergoing

reorganization in this court. Further, while it is argued that litigation by the Lipstick Parties will impair the jurisdiction of the Mexican court, it will not affect the adjudication of the ancillary case.

**13.** The last factor applies only in foreign proceedings concerning an individual debtor. It is immaterial in this case.

basis. *Id.* Accordingly, a prior decision to defer to a particular foreign court in one case is not determinative in a different case. *Id.* at 156.

"[C]omity is the ultimate consideration in determining whether to provide relief under § 304.... [A] court's function under § 304 is to determine whether comity should be extended to the foreign proceeding in light of the other factors." *Id.*[14] The first three factors under § 304(c) focus on the fairness and impartiality of the foreign proceeding. *See id.* at 158. The foreign proceeding must treat all creditors and interest holders justly, § 304(c)(1), protect United States creditors against prejudice and inconvenience in processing their claims, § 304(c)(2), and prevent preferential and fraudulent distributions. § 304(c)(3).

The Debtors' Mexican bankruptcy proceedings easily meet these concerns. Article 290 of the Mexican Act expressly provides that "foreign creditors shall have the same rights as Mexican creditors in relation to the commencement of a proceeding in this State and the participation pursuant to this act." Similarly, the Mexican Act permits all creditors, including American creditors, the opportunity to file claims, (*see* Mexican Act, Art. 125), litigate disputes before the Mexican court, (*id.*, Arts. 128–34), and appeal adverse determinations. (*Id.*, Arts. 135–44.) In fact, the Lipstick Parties filed claims, and thereafter, successfully challenged the list of creditors initially prepared by the conciliator. Finally, the Mexican Act provides for the recovery of preferential and fraudulent transfers made within 270 days of the business reorganization declaration date.[15] (*See id.*, Arts. 112–19.)

The Mexican Act also incorporates a highly structured process for achieving a consensual plan. Once a case is recognized by the Mexican court as a business reorganization, the case enters a "conciliation" stage for a maximum of 365 days. (*Id.*, Art. 145.) The court appoints a conciliator charged, *inter alia*, with the task of mediating between the debtor and its creditors and proposing a plan of reorganization. (*Id.*, Art. 148.) The debtor is obligated to cooperate with the conciliator. (*Id.*, Art. 150.) The plan must be approved by Recognized Creditors holding over 50% of the aggregate amount of (1) the allowed unsecured debt and the (2) allowed amount of the special privilege[16] and secured debt that sign the plan agreement. (*See id.*, Art. 157.) All unsecured

---

14. "Comity" is separately listed as a factor under § 304(c). Some have proposed that it be eliminated as a factor, and included in the preamble to § 304(c). *See Treco*, 240 F.3d at 157 n. 7. This change would reflect the view, endorsed by the *Treco* Court, that the decision whether to grant comity is the result of the application of the other factors. *Accord In re Axona Int'l Credit & Commerce Ltd.*, 88 B.R. 597, 608 (Bankr.S.D.N.Y.1988), *aff'd*, 115 B.R. 442 (S.D.N.Y.1990), *appeal dismissed*, 924 F.2d 31 (2d Cir.1991); *In re Culmer*, 25 B.R. 621, 629 (Bankr.S.D.N.Y.1982); *see Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 999 (2d Cir.1993)(listing factors).

15. For example, transactions are fraudulent if they are carried out under terms "which are significantly different from the conditions prevailing in the market in which the transactions were carried out, on the date on which they were carried out, or from trade usage and practice." (Mexican Act, Art. 114, § III.) This corresponds to the concept under the Bankruptcy Code that payments made outside of the ordinary course of business during the statutory period may be avoidable as preferences.

16. A "special privilege" creditor is one who has a right of retention, (Mexican Act, Art. 220), and the category includes bailees and sellers in possession. (*Melih Declaration* ¶ 32.)

creditors must receive *pro rata* treatment. (*Id.*, Art. 222.)

Creditors indicate their assent by signing the plan agreement. If the debtor and the requisite majority of creditors approve the agreement, the conciliator submits it to the judge for his approval.[17] (*Id.*) In order to approve the plan, the judge must decide that it meets the applicable requirements of the Mexican Act, and "is not inconsistent with any public policy provision." (*Id.*, Art. 164.) An approved plan binds the debtor and the unsecured creditors, (*id.*, Art. 165), and discharges the unpaid portion of the debt. (Tr. 81.) If the plan is rejected by the creditors or the court, the debtors will be liquidated. (Tr. 80; *see* Mexican Act, Art. 167.)

## 2. The Lipstick Parties' Objections

The Lipstick Parties have not raised a serious quarrel with the procedural fairness of the Mexican proceedings. Instead, their challenges relate to the treatment of their claims under the Mexican Act, and the amount of their recovery. Their challenge involves three distinct arguments. First, the Mexican Act does not recognize their judgment liens, and treats them as unsecured creditors. Second, the Sandovals, the Debtors' direct or indirect owners, will be able to retain their equity even though the unsecured creditors are not receiving full payment, in violation of the "absolute priority rule" codified under 11 U.S.C. 1129(b). Third, the Debtors will not be forced to distribute the value of any equity in their subsidiaries, violating the guarantee afforded by the "best interests" test. *See* 11 U.S.C. § 1129(a)(7).

### a. Judgment Liens

Section 304(c)(4) requires the court to consider the priority rules of the foreign jurisdiction. *Treco*, 240 F.3d at 158. The rules need not be identical to the priority scheme under United States law, but must be substantially in accordance with it. *Id.* The Mexican Act contains a scheme governing the distribution of the estate to secured, administrative, other priority and unsecured creditors. (*See* Mexican Act, Arts. 217–28.) The relative priority scheme does not, however, recognize judgment liens, and essentially subordinates judgment liens to the status of unsecured debt.

The Lipstick Parties maintain that they acquired a judgment lien under New York law in the Debtors' residual interests in the Tribasa Toll Road revenues when they served their execution. They further contend that their judgment lien was transferred or attached to the bond proceeds.[18] (*See* Letter, dated July 9, 2003, from Howard J. Kaplan to Court, at 3–5) ("Kaplan Letter.") Thus, they argue, the Mexican Act adversely affects their rights as judgment lien creditors, and a court should not grant ancillary relief that will result in the loss or substantial diminution in the value of a creditor's secured claim. *E.g.*, *Treco*, 240 F.3d at 159 (refusing to grant comity to Bahamian proceeding where American creditor's collateral would be used to pay administrative claims in light of "the special protected status that secured creditors enjoy under United States law"); *In re Papeleras Reunidas, S.A.*, 92 B.R. 584, 594 (Bankr.E.D.N.Y.1988)(refusing to grant

---

**17.** The judge must make the plan available to creditors who then have five days to file objections regarding the authenticity of their consent, and exercise their rights to veto the plan. (Mexican Act, Art. 162.) The plan may be vetoed by creditors holding at least 50% of the aggregate recognized debt. (*Id.*, Art. 163.)

**18.** The Lipstick Parties also assert lien claims in the ITA stock. This opinion only addresses the proceeds of the bond offering.

comity to Spanish liquidation because, *inter alia*, the proceeding subordinated the American secured creditor's claim to an unsecured status); *In re Toga Mfg. Ltd.*, 28 B.R. 165, 170 (Bankr.E.D.Mich.1983) (refusing to grant comity to a Canadian bankruptcy because the secured creditor would receive "substantially unequal treatment" under Canadian law).

When assessing the § 304(c) factors, a court should not deal in abstract differences. Rather, it "must consider the effect of the difference in the law on the creditor in light of the particular facts presented." *Treco*, 240 F.3d at 158–59. The subordination of judgment liens under the Mexican Act does not adversely affect the Lipstick Parties because they do not have judgment liens in the bond proceeds. First, their execution only pertained to the first judgment against Triturados. There is no evidence that Triturados ever had an interest in the revenues generated by the Tribasa Toll Roads. Instead, the revenues were originally the property of PAPSA and PACSA. Furthermore, before the Lipstick Parties served their execution, PAPSA and PACSA had already assigned the Tribasa Toll Road Revenues, initially to the Old Trustee, and subsequently, to the Trustee.[19]

Second, even if PAPSA and PACSA held an interest in the residual revenue, the Lipstick Parties' execution never reached that interest. They did not deliver an execution to PAPSA or PACSA, or show that they are alter egos of the Debtors. They merely pointed out that PAPSA and PAC-SA were direct or indirect subsidiaries, and along with the Debtors, were under the common control of Sandoval. In order to pierce the corporate veil or establish alter ego liability under New York law, the creditor must show domination and control by the shareholder or parent, the use of that position to commit a wrong or perpetrate a fraud, and injury. *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997); *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 322 (Bankr.S.D.N.Y. 1999); *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 852 (Bankr. S.D.N.Y.1994). There was no proof that Triturados (or Tribasa or Sandoval) used PAPSA or PACSA to commit a fraud or other wrong, and mere domination and control, or a parent-subsidiary relationship, is insufficient. *See American Fuel Corp.*, 122 F.3d at 134; *Morris v. New York State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1161 (1993).

Third, even if the Lipstick Parties had acquired a judgment lien in the residual Tribasa Toll Road receipts, their lien would not have attached to the proceeds of the bond offering. The toll road receipts represent the source for repayment of the bonds. The proceeds represent the amounts paid by the bond purchasers for the bonds. The toll revenues were not subsumed by or converted into the bond proceeds. The Trust continues to own the right to the toll revenues, even if some part of those rights is arguably subject to the Lipstick Parties' judgment lien.[20]

---

**19.** According to the Trust Agreement, the toll revenues were transferred to the Trustee free and clear of liens and encumbrances. Although the Trust Agreement was not provided by the Debtors until after the hearing, it was publically available through the website maintained by Bolsa Mexicana de Valores (www. bmv.com.mx) prior to the hearing. Neither party cited to the Trust Agreement, nor focused on the enforceability of the "free and clear language" under Mexican law.

**20.** The Lipstick Parties also contend that they should be able to enforce their $7 million judgment against the bond proceeds because

Consequently, the Lipstick Parties' rights in the bond proceeds are not affected by the subordination of their judgment lien claims under the Mexican Act because they do not have a judgment lien in the bond proceeds.

### b. The Absolute Priority Rule

 The Lipstick Parties expect, with good reason, that they will receive less than full payment on their claims. Nevertheless, the Sandovals will be able to retain their equity interests in the Debtors, *i.e.*, the enterprise value will not be distributed to the creditors. The Lipstick Parties contend that this treatment violates the absolute priority rule contained within the "fair and equitable" test under 11 U.S.C. § 1129(b)(2)(B).[21]

The objection lacks merit as the provisions of the Mexican Act largely mirror United States law. Under the Mexican Act, creditors signify their acceptance of the plan by signing it. The plan cannot be approved unless a majority of the creditors, in amount, execute it. Thus, the only way that the Sandovals can retain their

equity in the Debtors is with the consent of the majority of the debt.

The same is true under the Bankruptcy Code. Creditors may agree through a consensual plan to accept less than full payment but allow equity to retain some or all of their interests.[22] Section 1129(b), which imposes the fair and equitable requirement, only applies to non-consensual plans or "cramdowns," *i.e.*, where at least one of the impaired classes rejects the plan, but the plan otherwise complies with § 1129(a). *See* 11 U.S.C. § 1129(b)(1).

It is possible that the plan could be approved under the Mexican Act with only minority acceptance by the unsecured debt. There is only one "accepting" class, and the class includes the secured and special privilege creditors that sign the plan agreement. Here, the result seems unlikely given the amount of unsecured debt. (*See Melih Declaration*, Exs. D, at 17–20 (English translation); E, at 36–62 (English translation).) In any event, while the Mexican Act does not envision class by class voting, it still requires a majority vote to overcome the absolute priority

the funds are owned and controlled by Sandoval and are not part of the bankruptcy estates. (Kaplan Letter 5.) This argument is even weaker than the lien claim. The funds are not owned by Sandoval, but by the Trust. Further, they are not controlled by Sandoval; they are controlled by the Trustee who must disburse the proceeds in accordance with the Trust Agreement and related agreements. Finally, for the reasons discussed earlier, the proceeds merit protection because they are "involved in" the Debtors' bankruptcy case.

**21.** Section 1129(b)(2)(B) states that a plan is fair and equitable, with respect to a class of unsecured creditors, if it does not discriminate unfairly, and:
> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

Generally, a plan that pays the unsecured creditors less than the allowed amount of their claims, but permits shareholders to retain their interests, violates the fair and equitable test. The foregoing is subject, however, to the extent of the "new value" exception or corollary to the absolute priority rule.

**22.** Such plans are common where the debtor's shareholders continue to operate the business and fund the plan payments out of post-confirmation revenues. The shareholders would not have any incentive to continue to operate the debtor if they did not retain some or all of their equity.

rule, and this is substantially in accordance with the Bankruptcy Code.

### c. The Best Interests Test

▮ The Lipstick Parties make a related argument based on the "best interests" test under the Bankruptcy Code. Notwithstanding a fully consensual plan, American bankruptcy law still gives a limited veto to rejecting creditors. The court cannot confirm the plan if the rejecting creditors within an accepting class receive less than they would in a chapter 7 case. *See* 11 U.S.C. § 1129(a)(7).[23] This requirement, known as the "best interests" test, represents the minimum distribution that must be paid to the dissenting creditors.

▮ The Mexican Act does not include a "best interests" test. The Lipstick Parties contend that as a result, Tribasa will be able to retain its shares in its operating subsidiaries under the Mexican Act. In a hypothetical chapter 7 liquidation under the Bankruptcy Code, however, a trustee would liquidate those shares and distribute their value to the debtor's creditors.

The objection does not appear to implicate § 304(c)(4). By its terms, § 304(c)(4) is concerned with the order of distribution—the priority scheme. Rather, the Lipstick Parties' argument calls for a comparison between the amount of the distribution to unsecured creditors under the Mexican Act and the Bankruptcy Code. At bottom, the Lipstick Creditors argue that the Court should not grant comity because they may receive a smaller distribution on their unsecured claim in Mexico than they would receive on their unsecured claim under United States law. Section 304(c) does not, however, require that an unsecured creditor receive the same distribution in the foreign case and the hypothetical American bankruptcy.[24] *In re Board of Directors of Compania General de Combustibles S.A.*, 269 B.R. 104, 112 (Bankr. S.D.N.Y.2001).

In addition, the application of such a test would pose a significant obstacle to ever granting comity. The distribution to an unsecured creditor under any insolvency law depends on the amount of property available to the creditors and the relative priorities of their claims. The available property turns on numerous factors including how the law defines property of the estate, the extent of any exemptions and reach of the provisions relating to the avoidance of fraudulent and preferential transfers. The priorities are determined by statute, and may be fairly extensive, as evidenced by the numerous Bankruptcy Code priorities listed in 11 U.S.C. § 507(a).

To make the type of comparison that the Lipstick Parties' argument implies, a court would need to examine all aspects of the foreign law that might affect the amount of the distribution, prepare comparative matrices based on numerous assumptions, and

---

**23.** Section 1129(a)(7) states in pertinent part:
 (a) The court shall confirm a plan only if all of the following requirements are met:
 . . . .
 (7) With respect to each impaired class of claims or interests (A) each holder of a claim or interest of such class—
 (i) has accepted the plan; or
 (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date. . . .

**24.** If foreign law rendered the claim worthless, comity might be inappropriate. *See Finanz AG Zurich v. Banco Economico, S.A.*, 192 F.3d 240, 250 (2d Cir.1999)(foreign laws might be unfair if they rendered the creditor's claim unenforceable or valueless). Here, the Lipstick Parties have argued that their claims are worth less, not that they are worthless.

determine what the unsecured creditor would receive under the foreign and United States distribution scenarios. One example in this case shows the futility of such an approach. The Mexican Act permits the avoidance and recovery of payments made outside the ordinary course of business within 270 days of the bankruptcy recognition date. American law allows the trustee to reach back only 90 days before the petition date to recover an ordinary preference.

On the other hand, the same 270 day reach back period also applies to fraudulent transfers. This is shorter than the comparable one year period under 11 U.S.C. § 548 and much shorter than the state statute of limitations period incorporated through 11 U.S.C. § 544(b).[25] Since the potential preference and fraudulent transfer recoveries may be significant, I would have to estimate the potential recoveries under the Mexican Act and the Bankruptcy Code to decide if the Lipstick Parties were receiving less than they would be entitled to receive in a chapter 7 liquidation. On the debt side, I would also have to compute the value of the priority claims under Mexican and United States law.

For that matter, there is no proof that Debtors' equity interests in their subsidiaries have any value. PAPSA and PACSA assigned their principal assets, the future toll road revenues, to pay off the Trust's $190 million debt. No evidence was offered regarding the net worth of any other subsidiary. Thus, the Lipstick Parties' objection is a theoretical one. They have failed to show that they are adversely affected by the absence of a "best interests" test under Mexican law.

## C. The Debtors' Bad Faith

 The Lipstick Parties also argue that the Debtors' bad faith in the state court proceedings requires denial of their preliminary injunction motion, and by extension, any relief in this Court. Without doubt, the Debtors and the Sandovals have flouted numerous orders issued by Justice Ramos. Nothing in this opinion is intended to condone their contemptuous conduct.

Nevertheless, denying relief will hurt the Debtors' innocent creditors. The Lipstick Parties acknowledge, at least implicitly, that the Debtors sorely need to reorganize their debt. The Debtors owe over $1 billion to 1,500 creditors. The ability to pay even a portion of that debt depends on the use of the bond proceeds under an approved plan. The preliminary injunction is designed to protect the fund, and would inure to the benefit of all creditors.

Finally, the Lipstick Parties do not come to this Court with entirely clean hands. They point out, correctly, that the Debtors submitted to the jurisdiction of the New York courts under the 1993 note offering. After the judgments were recovered, the Debtors (and the Sandovals) flouted the orders of the New York court to such a degree that they were held in civil and criminal contempt.

They ignore, however, that similar charges may be levied against them. The Lipstick Parties submitted to the jurisdiction of the Mexican courts when they filed claims and objected to the proposed treatment by the conciliator. Yet they arguably ignored Mexican law and flouted the order of the Mexican court. Once the Mexican court recognized the Debtors' reorganization on March 22, 2002, the Mexican Act imposed a stay, lasting until the end of the conciliation stage, on the execu-

---

**25.** For example, New York's statute of limitations governing fraudulent transfer actions is six years. N.Y.C.P.L.R. § 213 (McKinney 1993).

tion of any seizure or enforcement order against the Debtors' property. (Mexican Act, Art. 65.) The Mexican court entered a comparable order at the time, suspending "[a]ny decree of attachment or enforcement against the rights and properties of the [Debtors]." (*Melih Declaration*, Ex. B, at 26.)

After March 22, 2002, and while the Mexican stays were in effect, the Lipstick Parties obtained contempt orders against the Debtors and the Sandovals based upon the failure to turnover the ITA stock and the transfer of $7 million in violation of the earlier restraining notices. They also served restraining notices and information subpoenas on Bancomext and Bancomer. The Debtors' expert opined that the service of the restraining notices violated the Mexican stay orders. (*See* Tr. 47.)

Based on the foregoing, the Debtors have demonstrated that they are likely to succeed on the merits of their claim that they are entitled to permanent injunctive relief. At a minimum, they have demonstrated a sufficiently serious question going to the merits to make it a fair ground for litigation, and a balance of the harms weighing in their favor. To minimize any harm, the restraint imposed by the Lipstick Parties will not be lifted unless and until the Mexican court approves a plan that provides for the use of the bond proceeds to pay creditors. If the plan process fails, the Lipstick Parties can continue their collection efforts.

### D. Irreparable Harm

■ Returning to the first prong of the preliminary injunction test, the need to show irreparable harm has not been uniformly applied in § 304 cases, largely due to the structure of § 304. Neither section 304(b)(1), which authorizes a bankruptcy court to issue injunctive relief, nor § 304(c), which describes the fac-

tors that the court must consider, requires a showing of irreparable harm. As a consequence, some cases have held that irreparable harm is not a condition to the issuance of preliminary injunctive relief. *In re MMG*, 256 B.R. at 551 (collecting cases). Others courts have insisted that the applicant must meet the usual preliminary injunction test, and show irreparable harm. *Id.* (collecting cases).

■ The dispute is immaterial in this case. The Debtors have demonstrated that they (and their creditors) will suffer irreparable harm if the Lipstick Parties are permitted to interfere with the bond proceeds on deposit in Mexico. The guiding principle of bankruptcy law is equality of distribution. *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 459 (2d Cir.1985). "As a rule, therefore, irreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of the other creditors." *In re MMG*, 256 B.R. at 555; *accord In re Lines*, 81 B.R. 267, 270 (Bankr. S.D.N.Y.1988); *see* 2 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 304.05, at 304–21 (15TH ed. rev.2003)("irreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and the fair distribution of assets in a single, centralized forum"). Permitting the Lipstick Parties to execute their judgments against the bond proceeds will diminish the recovery available to other creditors and possibly wreck the reorganization efforts.

### CONCLUSION

The Debtors are entitled to a preliminary injunction preventing the Lipstick Parties from executing their judgments against or interfering with the bond proceeds held by the Trustee. The injunction will also extend to the Tribasa Toll Road

revenues since they are inextricably intertwined with the bond offering, and hence, in the Mexican bankruptcy case, and the Lipstick Parties have failed to show that they enjoy a security interest in those receipts.

In the event that the Mexican court approves a plan that provides for the use of the proceeds to pay the Debtors' creditors, the Lipstick Parties' restraining notices will be deemed withdrawn to the extent that they interfere with or place any restraints on the use of the proceeds to fund their plan or for the other purposes discussed in the Preliminary Prospectus, or on the use of the Tribasa Toll Road revenues to repay the bonds. In the event that the Mexican bankruptcy case is disposed of in some other manner, either party may seek to modify the preliminary injunction as may be appropriate in light of subsequent developments.

Settle order on notice.