PAMLAB, L.L.C., Metabolite Laboratories, Inc., Breckenridge Pharmaceuticals, Inc., Plaintiffs,

v.

MACOVEN PHARMACEUTICALS, L.L.C., Defendant.

Macoven Pharmaceuticals, L.L.C., Counter Claimant,

v.

Pamlab, L.L.C., Metabolite Laboratories, Inc., Breckenridge Pharmaceuticals, Inc., Counter Defendants.

No. 11 Civ. 9022 TPG JCF.

United States District Court, S.D. New York.

June 29, 2012.

Bruce Daniel DeRenzi, Sean Eric Jackson, Crowell & Moring LLP, Charles Randolph Ross, Breckenridge Pharmaceuticals, Inc., for Plaintiffs, Counter Defendants.

Donald W. Washington, Robert Lawrence Waddell, Jones Walker, Lafayette, LA, Joseph John Perrone, Bennett, Giuliano, McDonell & Perrone, LLP, New York, NY, for Defendant, Counter Claimant.

## MEMORANDUM AND ORDER

JAMES C. FRANCIS IV, United States Magistrate Judge.

This is a patent infringement and false advertising case. Pamlab, L.L.C. ("Pamlab") developed a pharmaceutical product, which it markets as Foltx, using patented technology that it licensed from Metabolite Laboratories, Inc. ("Metabolite"). Foltx contains 2.5 mg of Folic Acid, 2 mg of Vitamin $B_{12}$, and 25 mg of Vitamin $B_6$, and was designed to treat elevated levels of homosysteine. Pamlab, in turn, has authorized Breckenridge Pharmaceuticals, Inc. ("Breckenridge") to market a generic version of the same product, which is sold as Folbic. Both Foltx and Folbic are labeled as "medical foods."

Macoven Pharmaceuticals, L.L.C. ("Macoven") has begun marketing a Folic Acid product labeled as "Folic Acid 2.5 mg Tablets—Prescription Dietary Supplement." According to the label, Macoven's product contains the same active ingredients in the same amounts as Foltx and Folbic. Based on these representations, Macoven's product has been designated as equivalent to Foltx—and as a substitute for Folbic—in the databases utilized by pharmacy chains to identify products that are alternatives for one another. The label of Macoven's product also includes an expiration date two years after the date of manufacture.

Pamlab and Breckenridge contend that, in several respects, the labeling of Macoven's product constitutes false advertizing in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). First, the plaintiffs argue that Macoven's identification of its product's active ingredients is misleading because it did not test its product prior to release to confirm the contents. Similarly, they maintain that the expiration date is false because it is not supported by adequate stability testing. Finally, the plaintiffs contend that the term "prescrip-

tion dietary supplement" is meaningless and therefore deceptive.

Pamlab and Breckenridge have moved pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction (1) enjoining Macoven from labeling its product in a way that suggests that it is the equivalent of Foltx or Folbic; (2) enjoining Macoven from marketing its product with statements that represent that it contains the specified amounts of active ingredients, has the specified expiration date, or is a "prescription dietary supplement"; (3) requiring Macoven to take action to have its product listed as obsolete or inactive on the industry databases; and (4) requiring Macoven to retract all pending offers to sell its product. The parties consented to referral of this motion to me for determination pursuant to 28 U.S.C. § 636(c). A hearing was held on May 30 and 31, 2012; and the parties subsequently made post-hearing submissions. This opinion constitutes my findings of fact and conclusions of law as required by Rules 52 and 65.

*Background*

Macoven's Folic Acid product was manufactured by Viva Pharmaceutical Inc. ("Viva"), a company based in British Columbia. (Tr. at 294; Declaration of Sherry Xie dated Feb. 29, 2012 ("Xie Decl."), ¶¶ 4, 7).[1] Ultimately, the product was marketed with a label that claims active ingredients consisting of 2.5 mg of Folic Acid, 2.0 mg of $B_{12}$, and 25.0 mg of $B_6$. (Exh. 5).[2] The label also shows an expiration date of September 2013. (Exh. 5). Viva formulated a pre-manufacture batch of the product in June 2011 and subjected it to preliminary testing. (Xie Decl., ¶ 7). On June 14, 2011, test results showed that representative tablets contained 3.23 mg of Folic

Acid. (Pl. Exh. 6, Appendix A to Plaintiff's Sur–Sur–Reply Memorandum in Support of Their Motion for a Preliminary Injunction Based on Defendant's Violation of the Lanham Act, at 1). Similarly, on June 22, 2011, tests showed that the tablets in the pre-manufacture batch contained 2.75 mg of Vitamin $B_{12}$ and 27.63 mg of Vitamin $B_6$. (Exh. 6 at 1). Viva also subjected samples of the pre-manufacture batch to accelerated stability testing. "This involves placing the samples" in a chamber with conditions of high temperature and relative humidity (40° Celcius ± 2°C and 75% Relative Humidity ± 5% RH) to cause accelerated degradation of the active ingredients. (Declaration of William Ment dated April 3, 2012 ("Ment 4/3/12 Decl."), ¶ 9). Results of the accelerated stability testing on this batch were recorded at two different times. On October 19–20, 2011, Folic Acid was measured at 3.29 mg, while on February 17, 2012, after the batch had been removed from the chamber and stored at room temperature for four months, $B_{12}$ tested at 2.06 mg and $B_6$ at 29.39 mg. (Exh. 6 at 1; Xie Decl., ¶ 17).

On September 2, 2011, Viva proposed to produce 750,000 tablets of the product for Macoven and submitted a production formula. (Xie Decl., ¶¶ 8, 9). That formula provided for overages for each of the active ingredients, that is, amounts by which these ingredients would exceed the label claims. (Xie Decl., ¶ 9 & Exh. G). According to that formula, the product would be manufactured with 3.0 mg of Folic Acid, 2.4 mg of $B_{12}$, and 33.4347 mg of $B_6$. (Xie Decl., 1 ¶ & Exh. G). Macoven accepted the proposal, and Viva manufactured the commercial batch of tablets, identified as Lot 41110122, on October 4, 2011, with 3.0

---

**1.** "Tr." refers to the transcript of the evidentiary hearing.

**2.** Unless otherwise indicated, exhibit numbers refer to the designation of exhibits introduced at the evidentiary hearing.

mg of Folic Acid, 3.0 mg of $B_{12}$, and 33.0 mg of $B_6$. (Exh. 5 eft 2; Xie Decl., ¶ 13).

Like the pre-manufacture batch, the production batch was subjected to testing. Viva issued a certificate of analysis on October 4, 2011, representing that the tablets in this batch contained 3.0 mg of Folic Acid and had an expiration date of September 2013, two years later. (Xie Decl., Exh. I). However, the certificate did not reflect results of any testing of the quantities of $B_{12}$ or $B_6$. (Xie Decl., Exh. I).

Viva did not subject the commercial batch to accelerated stability testing until February 2012. At the initiation of that test on February 13 and 14, the tablets were found to contain 2.99 mg of Folic Acid, 2.50 mg of $B_{12}$, and 29.01 mg of $B_6$. (Exh. 6 at 2). Thereafter, a sample was removed from the chamber and tested once a month for three months. After one month, testing showed 2.93 mg of Folic Acid, 2.25 mg of $B_{12}$, and 26.78 mg of $B_6$; after two months, 2.62 mg of Folic Acid, 2.22 mg of $B_{12}$, and 27.66 mg of $B_6$; and after three months, 2.575 mg of Folic Acid, 2.17 mg of $B_{12}$, and 27.04 mg of $B_6$.[3] (Exh. 6 at 2). The significance of the testing will be addressed below.

Once Macoven's product was on the market, it was listed on industry databases such as First DataBank and Medi–Span as an equivalent for Foltx and Folbic. (Tr. at 28, 73–74; Exhs. 3, 4). Such databases list as pharmaceutical equivalents those products that have the same active ingredients in the same concentrations and in the same dosage form (e.g., capsule or tablet). (Tr. at 71). A representative of a pharmacy making a purchasing decision is likely to consult one or more of the databases to determine what alternative products might fill the pharmacy's needs. (Tr. at 86). A major chain or a wholesaler that in turn sells to independent stores then generally negotiates price and other terms and selects a product. (Tr. at 87–88). Neither an individual pharmacist nor the ultimate consumer of the product usually exercises discretion; rather the choice is dictated by which product is stocked. (Tr. at 88–89, 147).

What the purchasing agent normally reviews in making a decision is a matter of disagreement. Irwin Wechsler, a consultant with many years of experience as a pharmacist and purchaser of pharmaceutical products who testified for the plaintiffs (Tr. at 57, 63), stated that it is industry standard for the purchasing representative to request and receive the certificate of analysis for a product, with the expectation that it will support the stated label amounts, as well as documentation of stability tests supporting any claimed expiration date. (Tr. at 87, 128). By contrast, Larry Lapila, Breckenridge's Executive Vice President who is responsible for the company's day-to-day operations (Tr. at 24–25), flatly contradicted Mr. Wechsler and testified that purchasers neither request nor receive either the certificate of analysis or stability studies. (Tr. at 190–91).

In this case, a major pharmaceutical chain, Rite Aid, ceased purchasing Breckenridge's product, Folbic, and began buying Macoven's product once it had been identified as a lower-priced equivalent. (Tr. at 27–28). Although Breckenridge has not yet lost other customers, the plaintiffs believe that if the Macoven product remains on the market, they will suffer losses in excess of $6 million. Based on current sales, the plaintiffs estimate that sales of Folbic would generate profits for both plaintiffs combined of $8,658,000 dur-

---

**3.** The results for $B_{12}$ at the end of the third month were obtained two weeks after the results for the other ingredients, apparently because of difficulties scheduling time on the testing equipment. (Tr. at 323).

ing the period from February 2012 through December 2012, when the patent expires. (Declaration of Larry J. Lapila dated Feb. 3, 2012 ("Lapila Decl."), ¶ 31; Tr. at 37–38). Competition from the Macoven product would cause Breckenridge to lose market share and also require it to reduce the price it charges for Folbic in order to retain customers. (Tr. at 30–31). Based on his experience, Mr. Lapila estimates that Breckenridge would lose 35% of its market share and would be forced to reduce its price by 50% to prevent further erosion. (Lapila Decl., ¶ 34; Tr. at 38). That would result in a loss of 75% of the plaintiffs' profits up to the end of December 2012, which equals $6,493,500. (Lapila Decl., ¶ 34; Tr. at 38).

I will discuss additional facts as they become relevant to the legal analysis.

*Discussion*

A. *Legal Framework*

1. *Preliminary Injunction Standard*

█ "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *accord UBS Financial Services, Inc. v. West Virginia University Hospitals, Inc.,* 660 F.3d 643, 648 (2d Cir.2011). Traditionally, the standard for preliminary injunctive relief in the Second Circuit has required the moving party to establish "irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor." *Almontaser v. New York City Department of Education,* 519

F.3d 505, 508 (2d Cir.2008) (internal quotation marks and citation omitted). In *Winter,* the Supreme Court cast some doubt on the continuing viability of "serious questions" prong of this standard, which "permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir.2010). The Supreme Court stated that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter,* 555 U.S. at 20, 129 S.Ct. 365. Nevertheless, the Second Circuit has since held that "our venerable standard for assessing a movant's probability of success on the merits remains valid."[4] *Citigroup Global Markets,* 598 F.3d at 38. Thus, a preliminary injunction may issue even if the probability of the movant ultimately prevailing is less than fifty percent.

█ The conventional standard is modified somewhat when the injunction sought is mandatory rather than prohibitory; that is, when it requires some positive act rather than simply maintaining the status quo. Under those circumstances, the injunction will issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of

4. The Fourth and Ninth Circuits, on the other hand, have held that *Winter* precludes the flexible approach still followed in this circuit. *See Real Truth About Obama v. Federal Election Commission,* 575 F.3d 342, 346–47 (4th Cir.2009), *vacated on other grounds,* —— U.S. ——, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010); *American Trucking Associations v. City of Los Angeles,* 559 F.3d 1046, 1052 (9th Cir.2009).

preliminary relief." *Id.* at 35 n. 4 (internal quotation marks and citations omitted).

■ Finally, for an injunction to issue, the threatened injury must be shown to be irreparable. "Normally, in order to be classified as 'irreparable,' the threatened harm must be a kind of injury for which a money judgment cannot compensate." *Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.,* 143 F.3d 688, 697 (2d Cir.1998), *rev'd on other grounds,* 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999). Nevertheless, even if a money judgment would normally suffice, an injury may be considered irreparable if it is shown that such a judgment would likely be uncollectible, by virtue, for example, of the defendant's insolvency. *See CRP/Extell Parcel I. L.P. v. Cuomo,* 394 Fed. Appx. 779, 781 (2d Cir.2010); *Brenntag International Chemicals, Inc. v. Bank of India,* 175 F.3d 245, 249–50 (2d Cir.1999).

### 2. *Lanham Act*

Section 43(a) of the Lanham Act provides in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

. . .

■ (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). A plaintiff bringing a false advertising claim under the Lanham Act can advance two alternative theories. The first is that the challenged advertisement is literally false. *See Time Warner Cable v. DIRECTV, Inc.,* 497 F.3d 144, 153 (2d Cir.2007); *S.C. Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 238 (2d Cir.2001). When an advertisement is shown to be false on its face, it may be enjoined without the need for extrinsic evidence demonstrating consumer deception or confusion. *See Time Warner Cable,* 497 F.3d at 153; *S.C. Johnson,* 241 F.3d at 238.

A plaintiff may show that an advertisement is literally false by necessary implication, when, considering the advertisement in its full context, the relevant audience would recognize the false implied claim as easily as if it had been stated explicitly. *See Time Warner Cable,* 497 F.3d at 158; *Pamlab, L.L.C. v. Seton Pharmaceuticals, LLC,* No. 10 Civ. 7680, 2010 WL 4983170, at *5 (S.D.N.Y. Dec. 6, 2010) ("Seton"). Under this doctrine, the court "must consider the advertisement in its entirety and not ... engage in disputatious dissection." *Time Warner Cable,* 497 F.3d at 158 (internal citation and quotation marks omitted). "However, only an *unambiguous* message can be literally false. Therefore, if the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." *Id.* (internal citations and quotation marks omitted).

A subspecies of the false by necessary implication doctrine is a challenge to an establishment claim:

[W]hen a defendant's promotion implicitly or explicitly refers to tests or data—a so-called "establishment claim"—a plaintiff can satisfy its burden of proving literal falsity by demonstrating that such tests are not sufficiently reliable to permit one to conclude with reasonable certainty that they established the claim made.

*Zeneca Inc. v. Eli Lilly & Co.,* No. 99 Civ. 1452, 1999 WL 509471, at *31 (S.D.N.Y.

July 19, 1999) (internal citations and quotation marks omitted). A plaintiff attacking an establishment claim is entitled to relief when it proves "either (i) 'that the tests were not sufficiently reliable to permit [the] conclusion' for which they are cited, or (ii) 'that the tests, even if reliable, do not establish the proposition asserted by the defendant' and are thus 'simply irrelevant.'" *Id.* at \*32 (alteration in original) (quoting *Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57, 63 (2d Cir.1992)). Like other challenges brought under the umbrella of literal falsity, an attack on an establishment claim need not rely on extrinsic evidence of confusion. *See id.*

A statement in advertising may be literally true but may nevertheless violate the Lanham Act because it is likely to deceive or confuse customers; this is an impliedly false claim. *See Time Warner Cable,* 497 F.3d at 153; *S.C. Johnson,* 241 F.3d at 238; *Seton,* 2010 WL 4983170, at \*5. "[P]laintiffs alleging an implied falsehood are claiming that a statement, whatever its literal truth, has left an impression on the listener [or viewer] that conflicts with reality'—a claim that 'invites a comparison of the impression, rather than the statement, with the truth.'" *Time Warner Cable,* 497 F.3d at 153 (alteration in original) (quoting *Schering Corp. v. Pfizer Inc.,* 189 F.3d 218, 229 (2d Cir.1999)). A party seeking to enjoin an implied claim, in contrast to a literal claim, must present extrinsic evidence of consumer deception or confusion. *See Time Warner Cable,* 497 F.3d at 153 n. 3; *Seton,* 2010 WL 4983170, at \*5.

■ Under either a literal or an implied theory of falsity, the plaintiff must also demonstrate materiality, that is, "that the false or misleading representation involved an inherent or material quality of the product." *Time Warner Cable,* 497 F.3d at 153 n. 3; see *Seton,* 2010 WL 4983170, at \*5. In the absence of a showing of materiality, a statement in advertising, even if false, would have no economic impact and could cause no injury.

**B.** *Likelihood of Success on the Merits*
**1.** *Identification of Active Ingredients*

■ The evidence on the record shows that, while the batch of Macoven's product that was released to market had been analyzed to determine the Folic Acid content and that testing supported that label claim, there had been no pre-release testing for Vitamins B6 and B12. Subsequent testing, however, supports the label claims for these ingredients as well. Nevertheless, the plaintiffs contend that the marketing of the product without pre-release analysis constitutes false advertising and warrants injunctive relief. That is not the case.

First, the representations on the label are not false as a matter of fact: the plaintiffs have not demonstrated that the Macoven capsules contain less than the stated amounts of the active ingredients.

Second, the label does not necessarily imply that the contents were assayed prior to release to market. The only unambiguous message communicated by the label is that the product contains the stated ingredients in the stated amounts; it says nothing definitive about the basis for those representations. *See Time Warner Cable,* 497 F.3d at 158 (holding that only unambiguous statement can be literally false). The label claims could be based as readily on the inputs to the manufacturing process as on post-manufacture testing. For the same reason, the plaintiffs have not sustained their establishment claim theory. The label makes no explicit reference to testing of the ingredients, and no such reference is implied. As one court has noted, "establishment claim ... cases do not stand for the proposition that a defendant must provide reliable test data for every factual statement in an advertisement to defend against allegations of false

advertising." *Intendis, Inc. v. River's Edge Pharmaceuticals, LLC,* No. Civ. A. 10–2419, 2011 WL 4442849, at *10 (D.Md. Sept. 22, 2011).

Finally, the plaintiffs argue that even if the label claim is literally true, it is deceptive and therefore violates the Lanham Act. Here, the plaintiffs have failed to present evidence sufficient to support their contention. They proffered no witness who actually encountered the Macoven product in the marketplace and who wrongly assumed that full pre-release testing had been performed. Likewise, the plaintiffs have submitted no scientifically rigorous survey of potential purchasers. They rely instead on the testimony of a few witnesses with experience in the field who, in any event, are not in accord. If, as Mr. Wechsler testified, purchasing representatives regularly demand and receive certificates of analysis prior to making purchasing decisions, they could not have been deceived by the product label, because they would know that the product had been assayed only for Folic Acid prior to marketing.

For Macoven to have proceeded to market its product without a full assay of the active ingredients identified on the label may well have been reckless, but when the evidence shows that the label claims are literally true, the plaintiffs are not likely to demonstrate that Macoven violated the Lanham Act.

### 2. *Expiration Date*

The legal analysis with respect to the expiration date claimed on the label of Macoven's product is somewhat different. An expiration date is the date through which a product's active ingredients remain present in the amounts indicated. Accordingly, the representation on the label is in effect a prediction, which implicitly has some basis in science.

The plaintiffs maintain that the placement of a two-year expiration date on Macoven's product communicated a representation that this date was supported by stability testing that met industry standards. Those standards, according to the plaintiffs, include what are known as the ICH Guidelines,[5] which in turn were incorporated into Viva's own quality control procedures.

Neither the Food and Drug Administration (the "FDA") nor any other regulatory body requires that the label of a dietary supplement include an expiration date. *Seton,* 2010 WL 4983170, at *9; Current Good Manufacturing Practice in Manufacturing, Packaging, Labeling, or Holding Operations for Dietary Supplements ("Labeling Practice"), 72 Fed.Reg. 34752, 34855–56 (June 25, 2007) (describing FDA decision not to require expiration date for dietary supplements). If, however, a manufacturer does advertise an expiration date, the FDA states that the "expiration date ... should be supported by data." Labeling Practice, 72 Fed.Reg. 34752, 34856 (June 25, 2007). The plaintiffs acknowledge that the results of a three-month accelerated stability test can support an expiration date of two years. (Declaration of William Ment dated May 24, 2012 ("Ment 5/24/12 Decl."), ¶ 3; Tr. at 75). They contend, however, that the application of any such test must conform to ICH Guidelines and argue that the testing performed by Viva here did not. In particular, the ICH Guidelines provide that where "significant" change occurs at the accelerated condition, an expiration date would have to be confirmed by intermediate or long-term testing. (Exh. 8 (ICH Guideline: Evaluation for Stability Data

---

**5.** ICH stands for International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use.

Q1E), § 2.4.2; Tr. at 220–21). Significant change, in turn, is defined as a "5% change in assay from its initial value." (Exh. 9 (ICH Guideline: Stability Testing of New Drug Substances and Products Q1A(R2)), § 2.2.7.1; Tr. at 222–23). Here, Viva's tests showed decreases in the amount of active ingredients in the commercial batch from the initial assay to the assay after three months under accelerated conditions of 13.88% for Folic Acid, 13.2% for B12 and 6.79% for B6, each in excess of 5%. (Exh. 6 at 3; Ment 5/24/12 Decl., ¶ 10).[6]

The plaintiffs' analysis is not persuasive for several reasons. First, the FDA has found no consensus within the dietary supplement industry as to the appropriate protocol and explicitly "decline[d] to offer guidance on the type of data that are acceptable to support an expiration date." Labeling Practice, 72 Fed.Reg. 34752, 34856 (June 25, 2007). *See Seton*, 2010 WL 4983170, at *9. Second, the ICH Guidelines provide recommended practices for drug manufacturers, not for dietary supplement manufacturers. (Tr. at 231–32). Third, the plaintiffs' witnesses were not conversant with the degradation profiles for the active ingredients at issue. (Tr. at 235, 251, 271). Thus, they would not be able to opine whether Folic Acid, for example, degrades at a constant rate or remains stable after an initial period of degradation. Without that information, it is not possible to determine whether Viva's

test results show "significant" degradation in a material sense.

The plaintiffs, then have not demonstrated that the expiration date of the Macoven product is not "based on data," which is the only industry standard established in the record.[7] Therefore, they have not shown a likelihood of success on the merits on their expiration date claim.[8]

### 3. *Prescription Dietary Supplement*

Although the plaintiffs asserted a claim of false advertising based on Macoven's characterization of its product as a prescription dietary supplement, they have presented no evidence on this issue. It therefore cannot be considered as a basis for injunctive relief.

### C. *Irreparable Injury*

■ As discussed above, an injury is not generally considered irreparable if it is capable of being remedied with money damages. *See Alliance Bond Fund*, 143 F.3d at 697. Nevertheless, the plaintiffs contend that they meet the standard for preliminary injunctive relief because Macoven would be unable, as a practical matter, to satisfy a judgment. I disagree.

In *Winter*, The Supreme Court emphasized that before preliminary relief may issue, the moving party must demonstrate that there is a significant probability of irreparable injury:

---

6. The plaintiffs not only object that the stability testing shows significant degradation; they also argue that Macoven's product should not have been released before such testing was completed. (Tr. at 76). However, as discussed above in connection with the initial assay of active ingredients, an expiration date is not unambiguous; while it might be based on prior testing, it could also be based, for example, on experience with similar products and then confirmed with post-release analysis. An expiration date is therefore not literally false merely because it was placed on a product without pre-release testing.

7. Even if Viva had adopted the ICH Guidelines in their entirety as its standard operating procedure, that would not make those guidelines the industry standard, which is the relevant touchstone for purposes of evaluating the effect of advertising on the market.

8. Macoven's product, of course, like any drug or dietary supplement with or without an expiration date, remains at risk of being withdrawn from the market at any time that its active ingredients no longer meet the label claims.

Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction. Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.

*Winter,* 555 U.S. at 22, 129 S.Ct. 365 (internal citations omitted). Consistent with this admonition, courts that have found irreparable injury because of the risk that a judgment will not be satisfied have required a showing that the defendant is insolvent, is on the verge of insolvency, or has tried to transfer or conceal assets. *See CRP/Extell Parcel I,* 394 Fed.Appx. at 781–82 (holding that moving party must show "that the risk of insolvency is likely and imminent"); *Alliance Bond Fund,* 143 F.3d at 697 (upholding preliminary relief where defendant found to be dissipating assets); *Sea Carriers Corp. v. Empire Programs, Inc.,* No. 04 Civ. 7395, 2006 WL 3354139, at *5 (S.D.N.Y. Nov. 20, 2006) (denying injunction where plaintiff failed to show that defendants were "insolvent or about to become so"); *Mitsubishi Power Systems, Inc. v. Shaw Group. Inc.,* No. 04 Civ. 1251, 2004 WL 527047, at *2, *4 (S.D.N.Y. March 16, 2004) (denying injunction in absence of showing "substantial chance" that defendant would be insolvent upon final resolution of pending proceedings).

The plaintiffs have made no such showing here. Their analysis depends on comparing the damages to which they would likely be entitled if they prevailed to Macoven's financial resources. First, the plaintiffs' estimate of their own potential damages is highly speculative. Rather than starting with evidence of their actual damages from the loss of Rite Aid as a customer, they rely instead on conclusory projections of the market share that would be lost and the price reductions that would be required if the Macoven product remains on the market. (Tr. at 38, 41). However, they provide no data to support these prognostications. Moreover, the plaintiffs acknowledge that any actual damage figure would now be less than what they originally calculated, because Macoven did not aggressively market its product in the intervening period. (Tr. at 40).

The plaintiffs' analysis of Macoven's financial strength is similarly flawed. They take publicly available information concerning Macoven's sales for 2011 and subtract revenue for products that were discontinued. (Lapila Decl., ¶ 27). They then discount that amount by a percentage to account for rebates, returns, and the like to obtain a figure for net sales; the discount factor, however, is based on Breckenridge's experience, not Macoven's. (Lapila Decl., ¶ 28). To this, the plaintiffs then apply a "typical net margin" to calculate net profits, and, again, this adjustment is not based on any information specific to Macoven. (Lapila Decl., ¶ 29). Indeed, the plaintiffs' analysis was done without reference to Macoven's balance sheet or even its annual report. (Tr. at 48–49). It is simply not sufficiently reliable to support a claim of likely irreparable injury.

D. *Public Interest and Balance of Equities*

■ Finally, neither the public interest nor the balance of the equities favors granting preliminary relief. Although it is important to the public for products to be properly labeled, the record does not demonstrate that Macoven's product is currently being offered on the market with false representations. And, while patent holders and their licensees are entitled to the protection of their economic rights,

there is a countervailing interest in open competition. There is currently no basis to conclude that the equities favor the plaintiffs.

### Conclusion

For the reasons set forth above, the plaintiff's motion for a preliminary injunction (Docket no. 23) is denied.

SO ORDERED.